John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
jnelson@milberg.com

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
cardoso@kolawyers.com

Leanna A. Loginov (*admitted pro hac vice*)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299
lloginov@shamisgentile.com

*Attorneys for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ***IN RE INTEGRATED SPECIALITY COVERAGES DATA BREACH LITIGATION*** | No. 3:25-cv-01741<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br>1. **Negligence**<br>2. **Breach of Implied Contract**<br>3. **Violation of California's Unfair Competition Law**<br>4. **Declaratory Judgement**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Mario Banda, John Pruitt, and Patrice Jarvis ("Plaintiffs"), on behalf of themselves and all others similarly situated ("Class Members"), allege the following Consolidated Class Action Complaint ("Action") against Defendant Integrated Specialty Coverages, LLC ("ISC" or "Defendant") upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel as follows:

## I. INTRODUCTION

1. Plaintiffs seek monetary damages and injunctive and declaratory relief for injuries arising from Defendant's failure to safeguard the Personally Identifiable Information[1] ("PII") and Protected Health Information ("PHI") (together, Private Information") of Plaintiffs and Class Members from unauthorized access to its information systems between February 16, 2025, and February 19, 2025, and the compromise and unauthorized disclosure of that Private Information, causing widespread injury and damages to Plaintiffs and the proposed (defined below) members.

2. Defendant is a Delaware limited liability company providing insurance services and underwriting products .[2] In the regular course of its for-profit business, Defendant collects information from consumers and is fully aware of the sensitivity of the information that it collects and its obligation to maintain that information as confidential and safe from unauthorized access.

---

[1] The Federal Trade Commission ("FTC") defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."17 C.F.R. § 248.201(b)(8). To be clear, according to Defendant, not every type of information included in that definition was compromised in the subject data breach.

[2] https://www.iscmga.com/about-us/.

3. The Private Information that the intruders targeted, accessed, and exfiltrated from Defendant's systems included Plaintiffs' and Class Members' names, Social Security and/or tax ID numbers, dates of birth, driver's license or other government ID numbers, biometric data (fingerprint image or similar), and basic medical information provided to ISC in connection with an insurance application or claim.[3]

4. As explained in detail herein, Defendant detected unusual activity in its computer systems and ultimately determined that an unauthorized third party accessed its network and obtained certain files from its systems between February 16, 2025 and February 19, 2025. ("Data Breach").[4]

5. Defendant's failure to safeguard Plaintiffs' and Class Members' highly sensitive Private Information violates its common law duty, industry standards, consumer expectations, California law, California public policy, and Defendant's implied contract with Plaintiffs and Class Members to safeguard their Private Information.

6. Defendant could have prevented this Data Breach by implementing reasonable, expected, and industry standard data security measures. Instead, Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement these measures to safeguard its current and former customers' Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Defendant's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

---

[3] *Id.*

[4] *See* Notice of Data Breach Letter, attached hereto as **Exhibit A**.

7. Plaintiffs and Class Members would not have provided their valuable Private Information had they known that Defendant would, *inter alia*, make their Private Information Internet-accessible, not encrypt personal and sensitive data elements, and not delete the Private Information it no longer had reason to maintain.

8. Plaintiffs and Class Members now face a lifetime risk of identity theft due to the nature of the information lost, which they cannot change, and which cannot be made private again.

9. Defendant's harmful conduct has injured Plaintiffs and Class Members in multiple ways, including: (i) the lost or diminished value of their Private Information; (ii) costs associated with the prevention, detection, and recovery from identity theft, tax fraud, and other unauthorized use of their data; (iii) lost opportunity costs to mitigate the Data Breach's consequences, including lost time; and (iv) emotional distress associated with the loss of control over their highly sensitive Private Information.

10. On behalf of themselves and the Class preliminarily defined below, Plaintiffs bring causes of action against Defendant for negligence, breach of implied contract, violation of California's unfair competition law, and declaratory judgment, seeking an award of monetary damages and injunctive and declaratory relief, resulting from Defendant's failure to adequately protect their highly sensitive Private Information.

## II. JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is over 100, and at least one Class Member is a citizen of a state that is diverse from

Defendant's citizenship, including Plaintiffs, each a citizen of States diverse from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

12. This Court has personal jurisdiction over Defendant because it has its principal place of business in California, and does a significant amount of business in California.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because Defendant has its principal place of business located in this District, and a substantial part of the events giving rise to this action occurred in this District.

## III. PARTIES

14. Plaintiff Mario Banda is, and at all times mentioned herein was, an individual resident and citizen of the State of Texas.

15. Plaintiff John Pruitt is, and at all times mentioned herein was, an individual resident and citizen of the State of Arizona.

16. Plaintiff Patrice Jarvis is, and at all times mentioned herein was, an individual resident and citizen of the State of Texas.

17. Defendant is a limited liability company organized under the laws of Delaware with its headquarters and principal place of business at 1811 Aston Ave., Suite 200, Carlsbad, CA 92008.

## IV. FACTUAL ALLEGATIONS

***Defendant's Business***

18. According to Defendant's website:

> Integrated Specialty Coverages (ISC) is a data and tech-forward, multi-line program administrator dedicated to underwriting excellence, client service, and enhanced customer experience.[5]

---

[5] https://www.iscmga.com/about-us/.

19. Plaintiffs and Class Members are current or former customers of Defendant who provided their Private Information to receive services from Defendant.

20. The information held by Defendant at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

21. Upon information and belief, Defendant made promises and representations to Plaintiffs and Class Members that the Private Information collected would be kept safe and confidential, the privacy of that information would be maintained, and Defendant would delete any sensitive information after it was no longer required to maintain it, including through its privacy policies.[6]

22. Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

23. Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep Plaintiffs' and Class Members' Private Information safe and confidential.

24. Defendant had obligations under the Federal Trade Commission Act, 15 U.S.C. § 45 ("FCT Act"), contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

[6] *See* Privacy Notice at https://www.iscmga.com/privacy-notice-non-eu/ ("We endeavor to protect your personally identifiable information. We use technical, administrative, and physical methods to maintain the integrity and security of our databases, including firewalls.").

25. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

26. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

27. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

28. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

29. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

30. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

31. Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

32. By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

***The Attack and Data Breach***

33. In or around June 2025, Defendant began notifying Plaintiffs and Class Members of the Data Breach, informing them by a Notice of Data Breach letter ("Notice")[7]:

> **What Happened?** Our security tools detected suspicious activity in a portion of our environment that we determined to be a security incident. Upon discovering the incident, ISC promptly contained the incident, notified law enforcement, and engaged external cybersecurity experts to investigate. The investigation determined that an unauthorized third party accessed a limited portion of ISC's environment between February 16 and February 19, 2025.
>
> **What Information Was Involved?** We have been performing a thorough review of the potentially impacted files to determine what data may have been involved. Based on this review, we have identified files containing your personal information, including your name, in combination with one or more of the following: social security and/or tax ID number, date of birth, driver's license or other government ID number, biometric data (fingerprint image or similar), and basic medical information provided to ISC in connection with an insurance application or claim.

34. To be clear – there are numerous issues with ISC's Data Breach, but the deficiencies in the Data Breach notification letter exacerbate the circumstances for victims of the Data Breach: (1) ISC waited ***four months*** to notify Plaintiffs and Class Members of the Data Breach; (2) ISC's security systems were so insufficient,

[7] Exhibit A.

that they could not determine the exact date of the breach, and could only provide a period spanning four days; (3) ISC fails to state whether it was able to contain or end the cybersecurity threat, leaving victims to fear whether the Private Information that ISC continues to maintain is secure; and (4) ISC fails to state how the breach itself occurred. All of this information is vital to victims of a data breach, let alone a data breach of this magnitude due to the sensitivity and wide array of information compromised in this specific breach.

35. Furthermore, Defendant's delay in notifying Plaintiffs and Class Members of the Data Breach is in direct violation of Defendant's responsibilities under the data breach notification statute in California. *See* Cal. Civ. Code § 1798.82(a) which requires that the disclosure notification be made "in the most expedient time possible and without unreasonable delay."[8]

36. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

37. As a result, the attacker accessed, acquired and viewed files in Defendant's computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including their name, Social Security and/or tax ID number, date of birth, driver's license or other government ID number, biometric data (fingerprint image or similar), and basic medical information provided to ISC in connection with an insurance application or claim. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

[8] While the definition of "reasonable" differs from state to state, it ranges between 30-60 days. Defendant failed to meet this requirement by over ***30 days***.

38. Plaintiffs further believe their Private Information, and that of Class Members, was subsequently viewed and sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

***Defendant Failed to Comply with FTC Guidelines, the GLBA, and Industry Standards***

39. Federal and state regulators have established security standards and issued recommendations to prevent data breaches and the resulting harm to consumers. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

40. The Federal Trade Commission ("FTC") has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[9]

41. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[10]

42. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of

---

[9] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/ documents/plain-language/pdf0205-startwithsecurity.pdf.

[10] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/ documents/plain-language/pdf-0136_proteting-personal-information.pdf.

data being siphoned from the system, and have a response plan in the event of a breach.

43. The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[11]

44. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the FTC Act. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

45. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

46. Defendant's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

47. The Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq*., defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A). Defendant qualifies as a financial institution under this definition and is subject to the GLBA.

48. Defendant collects nonpublic PII, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during

---

[11] *Id.*

the relevant period Defendant was subject to the requirements of the GLBA, 15 U.S.C. § 6801.1, et seq., and is subject to numerous rules and regulations promulgated under the GLBA.

49. Defendant's conduct is governed by Regulation P, 12 C.F.R. § 1016 ("Regulation P"), the rule that established the Privacy of Consumer Financial Information.

50. Defendant recognizes that it is subject to the GLBA and Regulation P.[12]

51. Defendant was thus aware at all times of its obligation to protect the Private Information of consumers. Defendant was also aware of the significant repercussions that would result from their failure to do so.

52. Defendant's inadequate data security measures violated applicable rules, regulations, and standards regarding data security. By not taking adequate security measures. Defendant violated the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq*., and the industry best practices that the GLBA requires for financial institutions.

53. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including:

a. designating one or more employees to coordinate the information security program;

b. identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and

[12] https://www.uhmgo.com/contentimages/706405964/UHM_Compliance_Policy_Manual.pdf?utm_source=chatgpt.com, at 30 (last accessed Nov. 3, 2025).

assessing the sufficiency of any safeguards in place to control those risks;

c. designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures;

d. overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and

e. evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

54. Defendant was subject to the Safeguard Rule and violated the Safeguard Rule.

55. Defendant failed to assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information.

56. Defendants' conduct resulted in myriad failures to follow GLBA-mandated rules and regulations, many of which are also industry standard.

57. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend

against those cyber-attacks.[13] All organizations collecting and handling Private Information, such as Defendant, are strongly encouraged to follow these controls.

58. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.[14]

59. Other best practices include but are not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, limiting access to sensitive information to only necessary employees, and securing application software.[15]

60. The following frameworks incorporate these data security measures and others and are regularly employed as industry standard practices: the NIST Cybersecurity Framework 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), NIST Special Publications 800-53, 53A, or 800-171;

---

[13] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf.

[14] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security.

[15] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf.

the Federal Risk and Authorization Management Program (FEDRAMP); or the Center for Internet Security's Critical Security Controls (CIS CSC), which are well respected authorities in reasonable cybersecurity readiness.

61. Defendant failed to follow these and other industry standards to adequately protect the Private Information of Plaintiffs and Class Members.

***Data Breaches are Preventable***

62. Data breaches are preventable.[16] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[17] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[18]

63. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S. Data breaches have been on the rise for several years. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1,400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

---

[16] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.
[17] *Id.* at 17.
[18] *Id.* at 28.

64. In light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

65. Additionally, as companies became more dependent on computer systems to run their business,[19] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[20]

66. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

67. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to millions of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

[19] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[20] https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

***The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft***

68. The unencrypted Private Information of Plaintiffs and Class Members will end up (if it has not already ended up) for sale on the dark web, as that is the *modus operandi* of hackers.

69. The ramifications of Defendant's failure to secure Plaintiffs' and Class Members' data are severe. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. The ramifications of Defendant's failure to secure Plaintiffs' and Class Members' data are severe. Moreover, as a result of Defendant's delay between detecting the Data Breach in February of 2025, and the Notice of the Data Breach sent to affected persons in June, the risk of fraud for Plaintiffs and Class Members increased exponentially.

70. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[21] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[22]

71. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[23] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and

---

[21] 17 C.F.R. § 248.201 (2013).
[22] *Id.*
[23] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[24] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[25]

72. When the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [Private Information] belonging to victims from countries all over the world. One of the key challenges of protecting Private Information online is its pervasiveness. As data breaches in the news continue to show, Private Information about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[26]

73. Identity thieves can use the Private Information that Defendant failed to keep secure to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud, such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain

---

[24] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[25] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[26] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://www.armor.com/resources/blog/stolen-pii- ramifications- identity-theft-fraud-dark-web/.

government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

74. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[27]

75. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a 's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[28] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[29]

76. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

---

[27] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

[28] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[29] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[30]

77. The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can sell for up to $1,000 online."[31]

78. Social Security numbers are particularly sensitive pieces of personal information. As the Consumer Federation of America explains:

> *This is the most dangerous type of personal information in the hands of identity thieves* because it can open the gate to serious fraud, from obtaining credit in your name to impersonating you to get medical services, government benefits, your tax refunds, employment – even using your identity in bankruptcy and other legal matters. It's hard to change your Social Security number and it's not a good idea because it is connected to your life in so many ways.[32]

79. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's

---

[30] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[31] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

[32] *Dark Web Monitoring: What You Should Know*, CONSUMER FEDERATION OF AMERICA (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (emphasis added).

picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[33]

80. The Social Security Administration further stresses that:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[34]

81. Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable. "Hackers harvest license numbers because they're a very valuable piece of information."[35]

---

[33] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[34] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

[35] *Hackers Stole Consumers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658 (last visited July 31, 2023).

82. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200."[36]

83. According to national credit bureau Experian:

> A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

84. According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[37] However, this is not the case. As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[38]

[36] https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-consumers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658 (last visited on Feb. 21, 2023)

[37] https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-consumers-to-watch-out-for-fraudulent-unemployment-claims/ (last visited on Feb. 21, 2023).

[38] *Id.*

85. Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[39]

86. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers and names.

87. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[40]

88. Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to target them with spam emails or solicitations to deceive the victim into providing the criminal with additional personal information.

---

[39] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html (last visited on Feb. 21, 2023).

[40] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf.

89. Phishing scammers use emails and text messages to trick people into giving them their personal information, including but not limited to passwords, account numbers, and social security numbers. Phishing scams are frequently successful, and the FBI reported that people lost approximately $18.7 million to such scams in 2023 alone.[41]

90. Accordingly, providing credit monitoring or reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. Javelin Research reported that "[f]raud-related resolution hours skyrocketed in 2023. The average amount of time consumers spent in 2022 resolving issues stemming from identity fraud clocked in at six hours, but in 2023, fraud resolution hours rose steeply, jumping to a nearly 10-hour average, a major disruption for consumers and financial institutions alike."[42]

91. Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting credit bureaus to place a fraud alert, reviewing their credit reports, placing a credit freeze on their credit, and correcting their credit reports.[43] The result is that Plaintiffs and Class Members are forced to spend their own personal time, or take time from work, to respond to the Data Breach and Defendant has not offered to compensate them for this loss of time.

---

[41] *Internet Crime Report*, FEDERAL BUREAU OF INVESTIGATION, (2023), https://www.ic3.gov/annualreport/reports/2023_ic3report.pdf scams.

[42] *Javelin Strategy & Research, 2024 Identity Fraud Study: Resolving the Shattered Identity Crisis* (2024), available at https://javelinstrategy.com/research/2024-identity-fraud-study-resolving-shattered-identity-crisis.

[43] *See* https://www.identitytheft.gov/Steps.

92. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet the resource and asset of time has been lost.

93. Because the information stolen in the Data Breach is immutable and cannot be changed, it can be used to perpetrate fraud and identity theft for the remainder of their lives. Plaintiffs and Class Members now face years of constant surveillance of their financial and medical records, monitoring, and loss of rights.

94. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members.

95. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

96. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

97. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

98. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

99. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

100. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

101. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[44]

102. Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies

[44] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[45]

***Diminution of Value of Private Information***

103. Private Information is valuable property.[46] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

104. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

105. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[47]

---

[45] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

[46] *See* n.42, *supra*.

[47] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

106. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[48]

107. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[49] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[50,51] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[52]

108. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

109. The fraudulent activity resulting from the Data Breach may not come

---

[48] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[49] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[50] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[51] https://datacoup.com/.

[52] https://www.thepennyhoarder.com/make-money/nielsenpanel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer.

to light for years.

110. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

111. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to thousands of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

112. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

***The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary***

113. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

114. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement

notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

115. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

116. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

***Loss of the Benefit of the Bargain***

117. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When seeking services from Defendant, Plaintiffs and other reasonable Customers understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

***Plaintiff Banda's Experience***

118. Plaintiff Banda is a former customer of Defendant. To obtain services from Defendant, he was required to provide his Private Information.

119. Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Banda's Private Information in its system.

120. Plaintiff Banda is very careful about sharing his sensitive Private Information. Plaintiff Banda stores any documents containing his Private

Information in a safe and secure location. Plaintiff Banda has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

121. Plaintiff Banda learned of the data breach after receiving the Notice. According to the Notice, Plaintiff Banda's Private Information was improperly accessed and obtained by unauthorized third parties. According to the Notice, the Private Information comprised included his name, date of birth, and driver's license or other government ID number provided to ISC in connection with an insurance application or claim.

122. As a result of the Data Breach, Plaintiff Banda made reasonable efforts to mitigate the impact of the Data Breach, including checking his bills and accounts to make sure they were correct. Plaintiff Banda has spent significant time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

123. As a result of the Data Breach, Plaintiff Banda fears for his personal financial security and uncertainty over what medical information was revealed in the Data Breach. He is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

124. As a result of the Data Breach, Plaintiff Banda anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

125. As a result of the Data Breach, Plaintiff Banda is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

126. Plaintiff Banda has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Pruitt's Experience***

127. Plaintiff Pruitt is a customer of Defendant. To obtain services from Defendant, he was required to provide his Private Information.

128. Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Pruitt's Private Information in its system.

129. Plaintiff Pruitt is very careful about sharing his sensitive Private Information. Plaintiff Pruitt stores any documents containing his Private Information in a safe and secure location. Plaintiff Pruitt has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

130. Plaintiff Pruitt learned of the data breach after receiving the Notice. According to the Notice, Plaintiff Pruitt's Private Information was improperly accessed and obtained by unauthorized third parties. The Private Information According to the Notice, the Private Information comprised included his name, date of birth, and driver's license or other government ID number provided to ISC in connection with an insurance application or claim..

131. As a result of the Data Breach, Plaintiff Pruitt made reasonable efforts to mitigate the impact of the Data Breach, including checking his bills and accounts to make sure they were correct. Plaintiff Pruitt has spent significant time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

132. As a result of the Data Breach, Plaintiff Pruitt fears for his personal financial security and uncertainty over what medical information was revealed in the Data Breach. He is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

133. As a result of the Data Breach, Plaintiff Pruitt anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

134. As a result of the Data Breach, Plaintiff Pruitt is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

135. Plaintiff Pruitt has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Jarvis's Experience***

136. Plaintiff Jarvis is a customer of Defendant. To obtain services from Defendant, she was required to provide her Private Information.

137. Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Jarvis's Private Information in its system.

138. Plaintiff Jarvis is very careful about sharing her sensitive Private Information. Plaintiff Jarvis stores any documents containing her Private Information in a safe and secure location. Plaintiff Jarvis has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

139. Plaintiff Jarvis learned of the data breach after receiving the Notice. According to the Notice, Plaintiff Jarvis's Private Information was improperly

accessed and obtained by unauthorized third parties. According to the Notice, the Private Information comprised included her name, date of birth, and driver's license or other government ID number provided to ISC in connection with an insurance application or claim.

140. As a result of the Data Breach, Plaintiff Jarvis made reasonable efforts to mitigate the impact of the Data Breach, including checking her bills and accounts to make sure they were correct. Plaintiff Jarvis has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

141. As a result of the Data Breach, Plaintiff Jarvis fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. She is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

142. As a result of the Data Breach, Plaintiff Jarvis anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

143. As a result of the Data Breach, Plaintiff Jarvis is presently at risk and will continue to be at increased risk of identity theft and fraud for years to come.

144. Plaintiff Jarvis has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

145. Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of the classes defined as:

> All individuals residing in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in June 2025 ("Class"); and
>
> All individuals residing in the State of California whose Private Information was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in June 2025 ("California Subclass").

146. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

147. Plaintiffs reserve the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

148. Numerosity. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, tens of thousands of individuals were impacted. The Class is apparently identifiable within Defendant's records, and Defendant has already identified these individuals (as evidenced by sending them breach notification letters).

149. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the

Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, including the following:

a. Whether Defendant engaged in the conduct alleged herein;

b. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure;

c. Whether Defendant's computer systems and data security practices used to protect Plaintiffs' and Class Members' Private Information violated the FTC Act, Industry Standards, and/or state laws, and/or Defendant's other duties discussed herein;

d. Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and Class Members;

e. Whether Defendant unlawfully shared, lost, or disclosed Plaintiffs' and Class Members' Private Information;

f. Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g. Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

h. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' Private

Information;

i. Whether Defendant breached duties to protect Plaintiffs' and Class Members' Private Information;

j. Whether Defendant's actions and inactions alleged herein were negligent;

k. Whether Defendant breached an implied contract to safeguard Plaintiffs' and Class Members' Private Information;

l. Whether Defendant were unjustly enriched by their conduct as alleged herein;

m. Whether Plaintiffs and Class Members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

n. Whether Plaintiffs and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

o. Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

150. Typicality. Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, were exposed to virtually identical conduct and now suffer from the same violations of the law as each other member of the Class.

151. Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole.

Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

152. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

153. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

154. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources

of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

155. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

156. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

157. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

158. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

159. Likewise, particular issues under Rule 23(c)(2) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant failed to timely notify the Plaintiffs and the class of the Data Breach.

b. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information.

c. Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts.

d. Whether Defendant's failure to institute adequate protective security measures amounted to negligence.

e. Whether Defendant failed to take commercially reasonable steps to safeguard individuals Private Information; and,

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## VI. CAUSES OF ACTION

**COUNT I**
**NEGLIGENCE**
**(On behalf of Plaintiffs and All Class Members)**

160. Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

161. Defendant requires Plaintiffs and Class Members to submit non-public Private Information in the ordinary course of providing its services.

162. Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business.

163. Plaintiffs and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

164. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

165. By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

166. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

167. Defendant had duties arising under the FTC Act and the GLBA to protect Plaintiffs' and Class Members' Private Information.

168. Defendant's violations of Section 5 of the FTC Act and the GLBA (and similar state statutes) constitute negligence *per se*.

169. Plaintiffs and Class Members are consumers within the class of persons that these statutes were intended to protect and the harm that has occurred is the type of harm these statutes were intended to guard against.

170. In addition, under state data security and consumer protection statutes such as those outlined herein, Defendant had a duty to implement and maintain reasonable security procedures and practices to safeguard Plaintiffs' and Class Members' Private Information.

171. Plaintiffs and Class Members were foreseeable victims of Defendant's violations of the FTC Act, the GLBA, and state data security and consumer protection statutes. Defendant knew or should have known that its failure to implement reasonable data security measures to protect and safeguard Plaintiffs' and Class Members' Private Information would cause damage to Plaintiffs and the Class.

172. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described herein, but also because Defendant is bound by industry standards to protect confidential Private Information. Defendant also had a duty to exercise appropriate clearinghouse practices to remove Private Information it was no longer required to retain pursuant to regulations.

173. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

174. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Class Members. That special relationship arose because Plaintiffs and Class

Members entrusted Defendant with their confidential Private Information, a necessary part of obtaining services from Defendant.

175. California Courts analyze six factors to determine the existence of a special relationship with no single factor being required or dispositive: (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

176. Here, each factor is satisfied as (1) the transactions in which Plaintiffs provided their Private Information to Defendant were for the purpose of receiving healthcare services; (2) data breaches targeting Private Information are readily foreseeable and the subject of frequent warnings by data security experts and state and federal governments; (3) the injuries associated with the theft and misuse of Plaintiffs' Private Information, including the expenditure of time and money mitigating the consequences of a data breach are alleged by Plaintiffs; (4) the theft of Private Information and Plaintiffs' allegations that Defendant failed to implement reasonable data security measures is logically connected to and proximately caused by the Data Breach; (5) the moral blame associated with Defendant's collection and use of Plaintiffs' Private Information for its own profit while failing to fund data security measures intended to protect Plaintiffs' Private Information from the foreseeable consequences of a data breach is high; and (6) imposing liability of Defendant for failing to safeguard Private Information will further California state policy of ensuring that personal information is protected and preventing the theft and misuse of Private Information by criminals.

177. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

178. Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

179. Defendant breached its duties and was, therefore, negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, (a) failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information; (b) failing to adequately monitor the security of their networks and systems; and (c) allowing unauthorized access to Class Members' Private Information.

180. A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly considering Defendant's inadequate security practices.

181. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the insurance industry.

182. Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

183. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private

Information of Plaintiffs and Class Members, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

184. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

185. Plaintiffs and Class Members had no ability to protect their Private Information that was in, and likely remains in, Defendant's possession.

186. Defendant was in an exclusive position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

187. But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and Class Members, the Private Information of Plaintiffs and Class Members would not have been compromised.

188. There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and Class Members and the harm, or risk of imminent harm, suffered by Plaintiffs and Class Members. The Private Information of Plaintiffs and Class Members was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

189. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of their Private Information; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to their

Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

190. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

191. Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

192. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

193. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On behalf of Plaintiffs and All Class Members)

194. Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

195. Defendant offered to provide services to Plaintiffs and Class Members, in exchange for payment.

196. Plaintiffs and Class Members were required to provide their Private Information to the Defendant to receive services.

197. In turn, Defendant impliedly promised and represented to protect Plaintiffs' and Class Members' Private Information through adequate data security measures, including through its privacy policies.

198. Plaintiffs and Class Members would not have paid for Defendant's services or entrusted their Private Information to Defendant but for the above-described agreement with Defendant.

199. Defendant materially breached its agreement(s) with Plaintiffs and Class Members by failing to safeguard such Private Information, violating industry standards necessarily incorporated in the agreement.

200. Plaintiffs and Class Members have performed under the relevant agreements, or such performance was waived by the conduct of Defendant.

201. The covenant of good faith and fair dealing is an element of every contract. All such contracts impose on each party a duty of good faith and fair dealing. The parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract along with its form.

202. Defendant's conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract.

203. The losses and damages Plaintiffs and Class Members sustained as described herein were the direct and proximate result of Defendant's breach of the implied contracts with them, including breach of the implied covenant of good faith and fair dealing.

**COUNT III**
**Violation of the California Unfair Competition Law,**
**Cal. Bus. & Prof. Code §17200 *et seq.***
**(On Behalf of Plaintiffs and the Class)**

204. Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

205. Defendant is a "person" defined by Cal. Bus. & Prof. Code § 17201.

206. Defendant violated Cal. Bus. & Prof. Code § 17200 et seq. ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

207. Defendant violated Cal. Bus. and Prof. Code § 17200, *et seq*., by engaging in unlawful and unfair business acts and practices as defined in Cal. Bus. Prof. Code § 17200.

208. The acts and omissions identified herein were conceived of, directed from, and emanated from Defendant's California headquarters and harmed consumers nationwide.

209. Defendant engaged in unlawful acts and practices by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiffs' and Class Members' Private Information with knowledge that the information would not be adequately protected; and by storing Plaintiffs' and Class Members' Private Information in an unsecure electronic environment in violation of California's data breach statutes, Section 5 of the FTC Act, 15 U.S.C. §45, the GLBA, the California Customer Records Act, California Civil Code § 1798.81.5, and 45 C.F.R. § 160.103 which require Defendant to take reasonable

methods of safeguarding the Private Information of Plaintiffs and the Class Members.

210. In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82.

211. Defendant's "unfair" acts and practices include: utilizing cheaper, ineffective security measures and diverting funds to its own profit, instead of providing a reasonable level of security that would have prevented the hacking incident; failing to follow industry standard and the applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data; failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' personal information.

212. Defendant's conduct was immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and Class Members. Further, Defendant's conduct narrowly benefited its own business interests at the expense of Plaintiffs' and Class Members' fundamental property and privacy interests protected by the California Constitution and the common law.

213. Defendant's actions caused damage to and loss of Plaintiffs' and Class Members' property right to control the dissemination and use of their personal information and communications. Defendant was in an exclusive position to protect the Private Information and Plaintiffs and Class Members had no way of reasonably avoiding the injury.

214. As a direct and proximate result of Defendant's violation of the UCL, Plaintiffs and Class Members lost money or property, including, but not limited to benefit of the bargain losses in the form of monies paid to Defendant on their behalf and intended to be devoted to data security, lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, and actual misuse of the compromised data.

215. Defendant knew or should have known that Defendant's computer systems and data security practices were inadequate to safeguard Plaintiffs' and Class Members' Private Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful and unfair practices and acts were knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiffs and Class Members.

216. Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the Class seek an order from this Court enjoining Defendant from continuing to engage, use, or employ its unfair business practices.

217. Plaintiffs and the Class Members have suffered injury-in-fact and would not have done business with or paid for Defendant's services if they had known that their association would put their Private Information at risk. Plaintiffs and the Class would not have given Defendant their Private Information had they known that their Private Information was vulnerable to a data breach. Likewise, Plaintiffs and Class Members seek an order mandating that Defendant implement adequate security practices to protect Class Members' Private Information. Additionally, Plaintiffs and the Class Members seek and request an order awarding Plaintiffs and the Class restitution of the money wrongfully acquired by Defendant by means of Defendant's unfair and unlawful practices.

**COUNT IV**
**Declaratory Judgement**
**(On Behalf of Plaintiff and the Class)**

218. Plaintiffs restate and reallege the preceding paragraphs as if fully set forth herein.

219. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious, and which violate the terms of the federal and state statutes described above.

220. An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to employing reasonable data security. Plaintiffs allege Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable. Additionally, Plaintiffs and the Class continue to suffer injury due to the continued and ongoing threat of new or additional fraud against them or on their accounts using the stolen data.

221. Under its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant continues to owe a legal duty to employ reasonable data security to secure the Private Information it possesses, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

b. Defendant continues to breach its duty by failing to employ reasonable measures to secure Plaintiffs and the Class Members personal and financial information; and

c. Defendant's breach of its legal duty continues to cause harm to Plaintiffs and the Class.

222. The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect Plaintiffs and the Class Members' data.

223. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiffs and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiffs and the Class, which include monetary damages that are not legally quantifiable or provable.

224. The hardship to Plaintiffs and the Class if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued.

225. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiffs, the Class, and the public at large.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

A. For an order certifying the Classes, as defined herein, and appointing Plaintiffs and their Counsel to represent the Classes;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws.

iii. requiring Defendant to delete, destroy, and purge the Private Information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive information security program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs and Class Members;

v. prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix. requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x. requiring Defendant to conduct regular database scanning and security checks;

xiv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their

confidential Private Information to third parties, as well as the steps affected individuals must take to protect themselves; and

xvi. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third-party assessor to conduct an attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment.

D. For an award of damages, including actual, statutory, nominal, and consequential damages, as allowed by law in an amount to be determined by a jury at trial;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and

G. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

## DOCUMENT PRESERVATION DEMAND

Plaintiffs demand that Defendant take affirmative steps to preserve all records, lists, electronic databases, or other itemization of telephone numbers associated with the communications or transmittal of the calls as alleged herein.

Dated: November 17, 2025 Respectfully Submitted,

By: /s/ *Leanna A. Loginov*

Leanna A. Loginov (*admitted pro hac vice*)
**SHAMIS & GENTILE, P.A.**
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone: (305) 479-2299

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
jnelson@milberg.com

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
cardoso@kolawyers.com

*Attorneys for Plaintiffs and Proposed Class*